IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KEISHA SHEALEY,

          Plaintiff,

    v.

PITTSBURGH MERCY HEALTH SYSTEM,
INC. d/b/a PITTSBURGH MERCY

          Defendant.

2:23-CV-01511-CCW

## OPINION

Plaintiff Keisha Shealey claims that her former employer, Pittsburgh Mercy Health System, discriminated against her on the basis of her race (African American) by issuing her a formal verbal warning and ultimately terminating her, retaliated against her for engaging in protected activity, and subjected her to a hostile work environment, all in violation of Title VII of the Civil Rights Act, the Pennsylvania Human Relations Act ("PHRA"), and Title 42, U.S.C. § 1981.[1] Pittsburgh Mercy has moved for summary judgment on all claims. ECF No. 42. For the reasons that follow, the Court will grant in part and deny in part Pittsburgh Mercy's Motion.

## I.    Material Facts

The following facts are drawn from the parties' consolidated factual statements and responses, which appear at ECF Nos. 55 and 56, and are undisputed unless otherwise noted.[2]

---

[1] The Court has jurisdiction over Ms. Shealey's Title VII and § 1981 claims under 28 U.S.C. § 1331 and exercises supplemental jurisdiction over her PHRA claims under 28 U.S.C. § 1367.

[2] Pittsburgh Mercy's Reply to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts appears at ECF No. 55 and is referred to herein as "DSOF." Pittsburgh Mercy's Response to Plaintiff's Counter-Statement of Material Facts appears at ECF No. 56 and is referred to herein as "PCSOF."

Pittsburgh Mercy is an is an integrated health care home and community behavioral health clinic that serves individuals who have intellectual disabilities.  ECF No. 55, DSOF ¶ 1.  Among other services, Pittsburgh Mercy provides community homes—referred to as Community Living Arrangements ("CLAs")—to individuals with intellectual disabilities.  *Id.* ¶ 2.  Ms. Shealey is an African American woman who began her employment with Pittsburgh Mercy on May 13, 2019.  ECF No. 56, PCSOF ¶¶ 2, 8.  Ms. Shealey was hired as a "casual contingent caregiver."  ECF No. 55, DSOF ¶ 28.  In this role, Ms. Shealey was responsible for providing direct care to physically and intellectually disabled residents in a group home setting.  *Id.*  An essential function of Ms. Shealey's job was to demonstrate knowledge of intellectual disabilities and mental health disorders and their accompanying symptoms.  *Id.* ¶ 35.  As a casual contingent worker, Ms. Shealey was able to take shifts at the Pittsburgh Mercy group home of her choosing so long as she worked a minimum of four shifts per month.  *Id.* ¶¶ 31–32.  Ms. Shealey typically chose to work all of her shifts at Pittsburgh Mercy's Norwich CLA.  *Id.* ¶ 33.

In mid-August 2022, a female resident of one of Pittsburgh Mercy's group homes ("S.R.") was moved to the Norwich CLA.[3]  *Id.* ¶ 37.  S.R. suffered from Down syndrome, Alzheimer's, and dementia.  *Id.* ¶ 38.  Pittsburgh Mercy was aware of reports that S.R. had used the N-word in the past.  ECF No. 56, PCSOF ¶ 29.  While the parties dispute the extent to which S.R. used the N-word immediately upon her arrival at the Norwich CLA, it is undisputed that she would say the N-word under her breath.  ECF No. 56, PCSOF ¶¶ 22–23.  At some point shortly after S.R. moved into the Norwich CLA, Ms. Shealey complained about S.R.'s use of the N-word to Pittsburgh Mercy's Human Resources Director, Kimberleigh Nash;  Ms. Shealey then informed her

---

[3] While Pittsburgh Mercy avers that S.R. was moved to the Norwich CLA on August 15, 2022, Ms. Shealey claims that it was on August 18, 2022.  ECF No. 55, DSOF ¶ 37.

supervisor, Hoda Lichwala, of this report on August 24, 2022, in a text message.[4]  *Id.*  ¶¶ 34–35, 41;  ECF No. 51, Ex. A.  There is nothing in the record demonstrating that Pittsburgh Mercy took action in response to Ms. Shealey's report.  ECF No. 56, PCSOF ¶¶ 37, 64, 66–67, 72–73;  ECF No. 55, DSOF ¶ 4.

On August 19, 2022, Pittsburgh Mercy employee Tara Stephens reported a patient rights violation by Ms. Shealey involving S.R.  ECF No. 55, DSOF ¶ 39.  Ms. Stephens alleged that Ms. Shealey had told other employees at the Norwich CLA that S.R.'s water use should be restricted after 5:00pm to prevent S.R. from wetting the bed.  *Id.* ¶ 40.  On August 19, 2022, Human Resources Director Nash informed Ms. Shealey that she was being placed on administrative leave with pay while Pittsburgh Mercy investigated Ms. Stephens' report.  *Id.* ¶ 43.  Pittsburgh Mercy ultimately determined that Ms. Shealey did not commit a patient rights violation.  *Id.* ¶ 47.  While this first rights violation was being investigated, Pittsburgh Mercy opened a second investigation into a separate report that Ms. Shealey had committed a patient rights violation, and again concluded that there was no violation.  *Id.* ¶¶ 48–49.  Ms. Shealey returned to work on September 7, 2022.  *Id.*

On September 12, 2022, Ms. Lichwala issued Ms. Shealey formal discipline in the form of a verbal warning (the "Corrective Action") for her "unprofessional and argumentative behavior" during Pittsburgh Mercy's investigation into the alleged August 19, 2022 patient rights violation.  ECF No. 55, DSOF ¶ 51;  ECF No. 51, Ex. M.  For example, Pittsburgh Mercy claimed Ms. Shealey yelled at various individuals, including Ms. Stephens and Ms. Nash, and was generally argumentative during the investigation.  ECF No. 51, Ex. M.  Ms. Shealey denies that she engaged

---

[4] Ms. Shealey also claims that she reported S.R's use of the N-Word to Gail Quigley-Smith, a Pittsburgh Mercy Senior Manager, but Ms. Quigley-Smith denied this.  ECF No. 56, PCSOF ¶¶ 34, 36.

in this conduct.  ECF No. 55, DSOF ¶ 51;  ECF No. 56, PCSOF ¶¶ 52–54.  The Corrective Action was the first time Ms. Shealey had been formally disciplined during her tenure at Pittsburgh Mercy. ECF No. 56, PCSOF ¶¶ 8, 51, 113.

On September 20, 2022, Ms. Shealey again complained about S.R.'s use of the N-word in a text message to both Ms. Lichwala and Frank Borelli, another Pittsburgh Mercy Senior Manager. ECF No. 56, PCSOF ¶¶ 12, 55;  ECF No. 51, Ex. A.  Specifically, Ms. Shealey stated that she was in a "protected class," and that "You guys aren't going to discipline the black woman because you don't like how I speak, but individual [sic] can say [the N-word] and there aren't any consequences."  ECF No. 51, Ex. A at 6.  In response, Mr. Borelli sent Ms. Shealey Ms. Nash's phone number, but he did not recall reporting the complaint to Ms. Nash himself, and he never spoke with Ms. Shealey about this complaint again.  ECF No. 56, PCSOF ¶¶ 58, 61–62.  Beginning at least as early as October 2022, S.R. began calling Ms. Shealey the N-word to her face, and Ms. Shealey verbally complained about this to her supervisors.  Id. ¶¶ 69–70, 72–73.[5]  As with Ms. Shealey's August 24 text message, there are no facts indicating that Pittsburgh Mercy investigated Ms. Shealey's subsequent complaints about S.R.'s use of the N-word.  ECF No. 56, PCSOF ¶¶ 37, 64, 66–67, 72–73;  ECF No. 55, DSOF ¶ 4.

In November 2022, Ms. Shealey was again investigated by Pittsburgh Mercy in connection with an alleged patient rights violation involving S.R.  ECF No. 55, DSOF ¶¶ 54–57.  Specifically, S.R. had complained that a staff member had pulled her out of bed by her leg.  Id.  Ms. Shealey was placed on administrative leave with pay while the report was investigated.  Id. ¶ 58.  Pittsburgh

---

[5] Pittsburgh Mercy denies this on the grounds that Shealey testified in her deposition that she did not specifically ask her supervisors to "investigate any complaint of discrimination."  ECF No. 56, PCSOF ¶ 69.  The heart of Pittsburgh Mercy's denial therefore appears to be not whether Ms. Shealey asked her supervisors to do something about S.R.'s use of the N-word, but that Ms. Shealey's reports about S.R.'s use of the N-word categorically were not complaints of discrimination.

Mercy ultimately found that no rights violation had occurred, and Ms. Shealey returned to work. *Id.* ¶¶ 62–63.

On December 30, 2022, Ms. Shealey was placed on administrative leave pending yet another investigation into an alleged patient rights violation involving S.R that occurred on December 29, 2022. *Id.* ¶ 83. The parties dispute exactly what happened on December 29, but it is undisputed that Pittsburgh Mercy ultimately concluded that Ms. Shealey had committed a patient rights violation and terminated her effective January 12, 2023. *Id.* ¶ 87. Pittsburgh Mercy's basis for terminating Ms. Shealey was her "unprofessional and inappropriate behavior toward S.R. during the December 29, 2022 incident, and (2) her failure to participate in the investigation into that incident." *Id.* ¶ 88. According to Pittsburgh Mercy, Ms. Shealey engaged in the following conduct on December 29, 2022 and shortly thereafter which led to her termination: (1) Ms. Shealey yelled at Amber Stewart, a Pittsburgh Mercy supervisor, over the phone regarding S.R.'s behavior on December 29, 2022 after S.R. slid out of her chair onto the ground; (2) Ms. Shealey initially refused to assist S.R. in getting up off of the ground, and instead told Ms. Stewart that she was going to finish cleaning chicken before assisting S.R.; (3) Ms. Shealey failed to promptly call 911 to assist with getting S.R. back on her feet, and instead only did so after Ms. Stewart had directed her to; (4) Ms. Shealey used profanity and told Ms. Quigley-Smith that she was leaving the Norwich CLA while the incident was still ongoing; (5) Ms. Shealey told S.R. that she hated her; and (6) Ms. Shealey refused to participate in Pittsburgh Mercy's investigation into the December 29, 2022 incident. ECF No. 55, DSOF ¶¶ 64–68, 72–74, 76–80, 85–88. Other than S.R. sliding out of her chair onto the ground, Ms. Shealey denies that any of these events actually occurred. *See id.*; ECF No. 56, PCSOF ¶¶ 88–94, 108–113.

After her termination Ms. Shealey instituted this lawsuit against Pittsburgh Mercy, alleging claims for disparate treatment, retaliation, and hostile work environment, all in violation of Title VII, the PHRA, and 42 U.S.C. § 1981. ECF No. 31. Pittsburgh Mercy now moves for Summary Judgment on all of Ms. Shealey's claims. ECF No. 42. With briefing complete, the Motion is now ripe for adjudication.

## II.   Legal Standard

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (alteration omitted) (quoting *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The burden to establish that there is no genuine dispute as to any material fact "remains with the moving party regardless of which party would have the burden of persuasion at trial." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (internal quotation marks omitted). Furthermore, "[i]f the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'" *Kaucher v. Cnty. Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

6

Once the moving party has carried its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87. Thus, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings" and point to "'specific facts showing that there is a genuine issue for trial,'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted). But, while the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor . . . to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence…." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (internal citations omitted). Instead, "there must be evidence on which the jury could reasonably find for the non-movant." *Id.* (cleaned up).

## III.    Discussion

Ms. Shealey asserts that Pittsburgh Mercy discriminated against her based on her race when it issued the Corrective Action in September 2022 and then terminated her employment in January 2023. ECF No. 50. She also claims that Pittsburgh Mercy retaliated against her for engaging in protected activity, specifically, complaining to her supervisors about S.R.'s frequent use of the N-word. *Id.* Additionally, Ms. Shealey asserts that Pittsburgh Mercy subjected her to a hostile work environment by failing to respond to S.R. repeatedly calling Shealey the N-word. *Id.* With respect to Ms. Shealey's race discrimination and retaliation claims, Pittsburgh Mercy argues that Ms. Shealey cannot make out a prima facie case of race discrimination or retaliation, and even if she could, that she cannot show that Pittsburgh Mercy's legitimate, non-discriminatory reasons for its

actions were pretextual.  ECF No. 43.  As for Ms. Shealey's hostile work environment claims, Pittsburgh Mercy argues that Ms. Shealey was not subjected to severe and pervasive discrimination, and in any event, a reasonable person in similar circumstances would not have been detrimentally affected by S.R.'s conduct.  *Id.*  After a careful review of the parties' briefing, the relevant case law, and the parties' voluminous 106-page combined statement and counterstatement of material facts (ECF Nos. 55 and 56), the Court concludes that Pittsburgh Mercy is entitled to summary judgment on Ms. Shealey's hostile work environment claims. However, the Court will deny summary judgment as to Ms. Shealey's disparate treatment and retaliation claims and allow those claims to proceed to trial.

### A.    Legal Framework

The familiar *McDonnell Douglas* burden-shifting framework applies to Ms. Shealey's discrimination and retaliation claims under Title VII, the PHRA, and § 1981.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973);  *Burton*, 707 F.3d at 425–27;  *Qin v. Vertex, Inc.*, 100 F.4th 458, 470–77 (3d Cir. 2024).

The *McDonnell Douglas* analysis has three steps.  First, the plaintiff must point to evidence sufficient to satisfy the elements of a prima facie case of employment discrimination or retaliation, thereby creating an inference that her employer acted unlawfully.  *See Burton*, 707 F.3d at 426. Next, the defendant must rebut this inference by articulating a legitimate, non-discriminatory reason for its actions.  *See id.*  The burden of production then shifts back to the plaintiff, who, in order to survive summary judgment, must provide evidence from which a jury could reasonably infer that the defendant's proffered explanation for its conduct is, in reality, pretext for unlawful discrimination or retaliation.  *See id.* at 426–27;  *see also Fuentes v. Perskie*, 32 F.3d 759, 763–64 (3d Cir. 1994) (setting forth burden shifting framework under *McDonnell Douglas* at summary

judgment).  Although the *McDonnell Douglas* framework contemplates a shifting burden of *production*, the burden of *persuasion* always remains with the plaintiff.  *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009).

The Court will first address Ms. Shealey's disparate treatment claims and retaliation claims under the *McDonnell Douglas* framework, and then separately turn to her hostile work environment claims.

### B.    Pittsburgh Mercy is Not Entitled to Summary Judgment on Ms. Shealey's Disparate Treatment Claims

Ms. Shealey asserts that Pittsburgh Mercy discriminated against her based on her race when it issued the Corrective Action in September 2022 and when it terminated her employment.[6]  ECF No. 50.  For the reasons set forth below, the Court finds that Pittsburgh Mercy is not entitled to summary judgment on Ms. Shealey's disparate treatment claims.

### 1.    Ms. Shealey Has Established a Prima Facie Case of Racial Discrimination

The Court finds that Ms. Shealey has made out a prima facie case of race discrimination with respect to the Corrective Action and her termination.  To prove a prima facie case of disparate treatment, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position she sought to attain or retain, (3) she suffered an adverse employment action, and (4) the action occurred under circumstances that support an inference of intentional discrimination.

---

[6] Ms. Shealey was placed on administrative suspension with pay three times prior to her termination.  ECF No. 55, DSOF ¶¶ 43, 58, 83.  Her only reference to these suspensions in her Opposition Brief is an argument that the circumstances surrounding her November 2022 suspension support an inference of discrimination because a white coworker was not targeted as a part of the investigation that led to that suspension.  *See* ECF No. 50 at 21.  But Ms. Shealey does not appear to argue that the suspensions with pay themselves were actionable, *see generally id.*, nor could she absent establishing that the suspensions caused her "some harm respecting an identifiable term or condition of employment," which she has not attempted to do.  *See Russo v. Bryn Mawr Tr. Co.*, No. 22-3235, 2024 WL 3738643, at *4 n.3 (3d Cir. Aug. 9, 2024) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024)).  Thus, the Court analyzes only whether Pittsburgh Mercy discriminated against Ms. Shealey when it issued the Corrective Action and ultimately terminated her.

*Qin*, 100 F.4th at 470, 473 (explaining that disparate treatment claims under Title VII, the PHRA, and § 1981 are examined together "because they fall under the same analytical framework.").

Here, Pittsburgh Mercy only contests the fourth element—whether the circumstances of the Corrective Action and Ms. Shealey's termination give rise to an inference of intentional discrimination with respect to each of those events. ECF No. 43 at 4. Additionally, Pittsburgh Mercy argues that it is entitled to summary judgment on Ms. Shealey's disparate treatment claim under § 1981 because she cannot show that her race was the "but-for" cause of any adverse employment action. ECF No. 43 at 8–9; *Comcast Corp. v. Nat'l Assoc. of African American-Owned Media*, 589 U.S. 327, 341 (2020).

To establish circumstances supporting an inference of intentional discrimination, a Plaintiff may either:

> (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between [her] membership in a protected class and the adverse employment action.

*Drummer v. Hosp. Univ. Pa.*, 455 F. Supp. 3d 160, 168 (E.D. Pa. 2020) (citing *Green v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014)).

### a.    Ms. Shealey Has Established a Prima Facie Case with Respect to the Corrective Action

With respect to the Corrective Action, Ms. Shealey relies on circumstantial evidence to establish a causal nexus between her protected class and the corrective action. Specifically, Ms. Shealey argues that leading up to issuance of the Corrective Action, S.R. had been using the N-word, and that when Ms. Shealey complained to her supervisors she was ignored. ECF No. 50 at 17. Ms. Shealey is African American, and the parties agree that the N-word is a racial slur that

10

carries historic connotations of racism and racial discrimination towards African Americans. ECF No. 56, PCSOF ¶¶ 2, 18. While the parties dispute whether S.R. had begun directing the N-word at Ms. Shealey specifically prior to the Corrective Action, it is undisputed that S.R. had been using it. *Id.* ¶¶ 22–23. Ms. Shealey reported S.R.'s use of the N-word to Human Resources Director Nash, *id.* ¶¶ 34–35, and informed her supervisor Ms. Lichwala of this report on August 24, 2022, *id.* ¶ 41. There are no facts demonstrating that Pittsburgh Mercy investigated Ms. Shealey's complaint. *Id.* ¶¶ 37, 64, 66–67, 72–73; ECF No. 55, DSOF ¶ 4. All of this, Ms. Shealey argues, lends itself to an inference that her race caused Pittsburgh Mercy to issue the Corrective Action. ECF No. 50 at 17–18. The Court agrees.

The lack of evidence that Pittsburgh Mercy took any action in response to Ms. Shealey's report that S.R. had been using the N-word can reasonably be interpreted as "the type of subtle discrimination which is considered to be within the scope of Title VII." *Davis v. Nat'l R.R. Passenger Corp.*, 733 F. Supp. 2d 474, 487, 491 (D. Del. 2010) (finding an inference of racial discrimination on the part of Amtrak because it failed to respond to acts of vandalism against the plaintiff that were potentially motivated by racism); *see also Mandell v. Cnty. Of Suffolk*, 316 F.3d 368, 378–79 (2d Cir. 2003) (finding that an employer's failure to investigate allegations of an anti-Semitic atmosphere in the workplace raised an inference of "illegal animus"). The Court therefore concludes that Ms. Shealey has established a prima facie case of disparate treatment under Title VII, the PHRA, and § 1981[7] with respect to the Corrective Action.

---

[7] It is true that the United States Supreme Court has held that to prevail on a § 1981 claim a plaintiff must ultimately "prove that but for [her] race, [she] would not have been discriminated against," *Williams v. Tech Mahindra (Americas) Inc.*, 70 F.4th 646, 651 (3d Cir. 2023) (citing *Comcast*, 589 U.S. at 341), and that this is a higher causal burden than is required for Title VII disparate treatment claims, *Comcast*, 589 U.S. at 337–38. However, the United States Court of Appeals for the Third Circuit has made it clear that *Comcast* "does not impinge in the least on the indirect methods of proof formulated by the Supreme Court for employment discrimination claims," including the application of *McDonnell Douglas* framework to both Title VII and § 1981 claims. *Tech Mahindra*, 70 F.4th at 651. Thus, at the prima facie case stage of *McDonnell Douglas*, a § 1981 plaintiff need only present evidence that tends to

**b.      Ms. Shealey Has Established a Prima Facie Case with Respect Her Termination**

With respect to her termination, Ms. Shealey relies on comparator evidence as well as the continued failure of her supervisors to respond to S.R.'s use of the N-word—which was increasing in intensity.  ECF No. 50 at 17–21.  The Court will first evaluate Ms. Shealey's proffered comparator, and then review her additional evidence of discrimination.

**i.      Ms. Shealey's Proffered Comparator, Zastawa, Is Not Similarly Situated**

Comparators must be "similarly situated" to the plaintiff, taking into consideration factors such as whether the comparator and the plaintiff had the same supervisor, were subject to the same standards, and engaged in similar conduct.  *Durst v. City of Phila.*, 798 F. App'x 710, 713 (3d Cir. 2020).  "[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions."  *Newman v. Point Park Univ.*, No. 2:20-CV-00204, 2022 WL 969601, at *14 (W.D. Pa. Mar. 31, 2022) (Hornak, C.J.) (quoting *Doe v. Apria Healthcare Grp. Inc.*, 97 F. Supp. 3d 638, 645 (E.D. Pa. 2015)).

Here, Ms. Shealey argues that her white coworker, "Zastawa," is a relevant comparator.  ECF No. 50 at 21.  According to Ms. Shealey, Ms. Zastawa should have been targeted alongside Ms. Shealey as part of Pittsburgh Mercy's investigation into an incident where S.R. complained

---

show that her race was the "*likely reason* for the adverse [employment] action. . . . To hold otherwise 'would be tantamount to eliminating the *McDonnell Douglas* framework.'"  *Onely v. Redner's Markets, Inc.*, 697 F. Supp. 3d 410, 421 (E.D. Pa. 2023) (quoting *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017) (analyzing Title VII and § 1981 disparate treatment claims together).

that someone pulled her to the edge of her bed on the morning of November 4, 2022[8] because Ms. Zastawa wrote a witness statement implying that she would have been the one to wake S.R. up on days when she attended her day program.  ECF No. 50 at 21.  However, Ms. Shealey ignores that Pittsburgh Mercy Senior Manager Quigley-Smith identified her as the target of the investigation "based on the schedule," ECF No. 56, PCSOF ¶ 82, and that Ms. Shealey herself submitted a statement in connection with the investigation in which she confirmed that she was the one who woke S.R. up on the day in question, ECF No. 55, DSOF ¶ 61; ECF No. 45, Ex. B at 178–79.

Moreover, Ms. Shealey sets forth almost no facts regarding Ms. Zastawa in her Opposition Brief from which the Court could conclude that Ms. Zastawa is a similarly situated comparator. ECF No. 50 at 21.  She does not identify what Ms. Zastawa's job title is, who her supervisor was, or what exactly her duties entailed—all factors which the Court must consider in weighing whether Ms. Zastawa is a sufficient comparator.[9]  *Id.*; *Durst*, 798 F. App'x at 713.  Even if Ms. Shealey had set forth those facts, Ms. Zastawa would not be an appropriate comparator because it is clear that she was never alleged to have engaged in the same kind of conduct which led to Ms. Shealey's termination.  *See Newman*, 2022 WL 969601, at *14 (noting that the proffered comparator must have engaged in conduct "nearly identical" to that which caused the challenged adverse employment action).  Pittsburgh Mercy purported to terminate Ms. Shealey for exhibiting "unprofessional and inappropriate behavior" towards S.R. during an incident which occurred on

---

[8] On November 11, 2022, Ms. Shealey was placed on administrative leave with pay pending the outcome of this investigation, which ultimately did not substantiate a patient rights violation.  ECF No. 55, DSOF ¶¶ 58, 62.

[9] While Ms. Shealey cites to Ms. Zastawa's witness statement as well as portions of her own and Ms. Quigley-Smith's deposition testimony, the portions of the record that Ms. Shealey cites to do not establish that Ms. Zastawa is Caucasian, let alone that she and Ms. Shealey had similar job duties and work history and shared the same supervisors. "[I]t is incumbent on [Ms. Shealey] to direct us to those parts of the record that support her argument, not simply to provide the Court with an extensive record and expect us to construct an argument on her behalf."  *Finzie v. Peake*, 548 F. Supp. 2d 171, 174 n.6 (E.D. Pa. 2008).

December 29, 2022, and her failure to participate in Pittsburgh Mercy's investigation into that incident.  ECF No. 55, DSOF ¶ 88.  Ms. Shealey has not identified any evidence that Ms. Zastawa engaged in—or was alleged to have engaged in—any comparable misconduct in relation to the November 4, 2022, incident involving S.R.  Accordingly, Ms. Zastawa is not a similarly situated comparator.

> ### ii.    Circumstantial Evidence Supports an Inference of Discrimination With Respect to Ms. Shealey's Termination

With respect to her termination, Ms. Shealey relies on Pittsburgh Mercy's continued failure to do anything about S.R.'s use of the N-word as evidence supporting an inference of discrimination.  Specifically, after Pittsburgh Mercy issued the Corrective Action, Ms. Shealey again complained about S.R.'s use of the N-word without any consequences in a text message sent to both Ms. Lichwala and Mr. Borelli on September 20, 2022.  ECF No. 56, PCSOF ¶ 55.  In response, Mr. Borelli sent Ms. Shealey Ms. Nash's phone number, but he did not recall reporting the complaint to Ms. Nash himself, and he never spoke with Ms. Shealey about this complaint again.  *Id.* ¶¶ 58, 61–62.  Beginning at least as early as October 2022, S.R. began calling Ms. Shealey the N-word to her face, and Ms. Shealey verbally complained about this to her supervisors.  *Id.* ¶¶ 69–70, 72–73.[10]  As with Ms. Shealey's August 24 text message, there are no facts indicating that Pittsburgh Mercy investigated Ms. Shealey's continued complaints about S.R.'s use of the N-word.  ECF No. 56, PCSOF ¶¶ 37, 64, 66–67, 72–73;  ECF No. 55, DSOF ¶ 4.

---

[10] While Pittsburgh Mercy denies Ms. Shealey's claim that she made verbal reports to her supervisors, ECF No. 56, PCSOF ¶ 69, its denial is based on how Ms. Shealey's complaints to her supervisors ought to be characterized, not whether they occurred.

As with the Corrective Action, the Court finds that the lack of any evidence that Pittsburgh Mercy took action in response to S.R.'s continued and increasing using of the N-word towards Ms. Shealey supports an inference of discrimination with respect to Ms. Shealey's termination that is sufficient to establish a prima facie case of disparate treatment under Title VII, the PHRA, and § 1981. *See Davis*, 733 F. Supp. 2d at 491; *Mandell*, 316 F.3d at 378–79.

### 2.    Disputed Issues of Material Fact Remain Regarding Pretext

Neither party addresses whether Pittsburgh Mercy offered satisfactory legitimate reasons for Ms. Shealey's termination; the parties instead proceed directly to pretext. ECF Nos. 43 at 18; 50 at 11; 54 at 3. Accordingly, the Court assumes that Pittsburgh Mercy's legitimate reasons are satisfactory and analyzes whether Ms. Shealey has presented sufficient evidence to establish that those reasons were pretextual.

To show an employer's proffered reasons for an adverse employment action were a pretext for discrimination, a plaintiff must offer some direct or circumstantial evidence from which a factfinder could reasonably (i) disbelieve the employer's stated reasons for the action, or (ii) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018); *Fuentes*, 32 F.3d at 764. To meet her burden under the first method, Ms. Shealey's evidence "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 765). "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

prudent, or competent." *Fuentes*, 32 F.3d at 765. The second method of proving pretext requires the plaintiff to produce evidence that could cause a factfinder to believe that a discriminatory reason was more likely than not a determinative factor for its adverse employment action. *Qin*, 100 F.4th at 474–75. One way a plaintiff can make this showing is where "the employer treated other . . . similarly situated persons not of [her] protected class more favorably." *In re Tribune Media Co.*, 902 F.3d at 403.

Here, the Court finds that Ms. Shealey has met her burden of establishing pretext under the first method because there are material issues of disputed fact surrounding Pittsburgh Mercy's reasons for issuing the Corrective Action and terminating Ms. Shealey. With respect to the Corrective Action, Pittsburgh Mercy states that the Corrective Action was issued because of Ms. Shealey's "unprofessional and argumentative behavior" during its investigation into an alleged patient rights violation involving S.R. that occurred on August 19, 2022.[11] ECF No. 55, DSOF ¶ 51. But Ms. Shealey denies that she engaged in the behavior identified by Pittsburgh Mercy. *Id.*; ECF No. 56, PCSOF ¶¶ 52–54. This is a dispute of material fact that precludes summary judgment because "[e]ntering summary judgment in [Pittsburgh Mercy's] favor would require believing [Pittsburgh Mercy's] version of events while discounting [Ms. Shealey's], or in other words, would result in the court assessing witness credibility and weighing evidence." *Carswell v. Steak 'N Shake, Inc.*, No. 19-CV-1580, 2021 WL 3553522, at *8 (W.D. Pa. July 27, 2021), *report and recommendation adopted sub nom. Carswell v. Steak N Shake, Inc.*, No. 2:19-CV-1580, 2021 WL 3549325 (W.D. Pa. Aug. 11, 2021) (Colville, J.); *see also Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990) ("[T]here is no rule of law that the testimony of a discrimination

---

[11] Ms. Shealey was placed on administrative leave with pay while this investigation was ongoing, and ultimately Pittsburgh Mercy did not substantiate any rights violation. ECF No. 55, DSOF ¶¶ 39–40, 42–50.

plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion.").

Similar material disputes cloud the reasons for Ms. Shealey's termination. Pittsburgh Mercy states it terminated Ms. Shealey for exhibiting "unprofessional and inappropriate behavior" towards S.R. during an incident which occurred on December 29, 2022 and failing to participate in Pittsburgh Mercy's investigation into that incident. ECF No. 55, DSOF ¶ 88. On Pittsburgh Mercy's telling, Ms. Shealey's conduct included, among other things, yelling at a supervisor, Ms. Stewart, over the phone, telling Ms. Stewart that she was going to finish cleaning chicken before assisting S.R., who had fallen to the ground, and telling S.R. that she hated her. ECF No. 55, DSOF ¶¶ 64–68, 72–74, 76–80, 85–88. Ms. Shealey denies that she engaged in any of the conduct cited by Pittsburgh Mercy. *See id.*; ECF No. 56, PCSOF ¶¶ 88–94, 108–113.[12] Though Pittsburgh Mercy characterizes Ms. Shealey's testimony as self-serving, ECF No. 56, PCSOF ¶¶ 92–94, it is sufficient to preclude summary judgment, *see Carswell*, 2021 WL 3553522, at *8; *Weldon*, 896 F.2d at 800. If a jury were to believe Ms. Shealey's testimony that she did not engage in the conduct identified by Pittsburgh Mercy as the basis for the Corrective Action and her termination, it could rationally conclude, based on the other evidence in the record, that her race was the real reason for the Corrective Action and her termination.[13] For the foregoing reasons, Pittsburgh

---

[12] The disputes regarding what actually happened on December 29, 2022, are evident from a review of the deposition testimony in the record. *Compare* Borelli Dep., ECF No. 45-4 at 43:14–46:5, *with* Shealey Dep., ECF No. 51-3 at 120:3–123:19, ECF No. 45-2 at 119.

[13] With respect to Ms. Shealey's § 1981 claim, a reasonable jury could also conclude based on the record evidence that that but-for her race, Ms. Shealey would not have been disciplined or terminated.

Mercy is not entitled to summary judgment on Ms. Shealey's disparate treatment claims under Title VII, the PHRA, or § 1981.[14]

> **C.    Pittsburgh Mercy is Not Entitled to Summary Judgment on Ms. Shealey's Retaliation Claims**

Ms. Shealey asserts that Pittsburgh Mercy retaliated against her for engaging in protected activity by issuing the Corrective Action and ultimately terminating her.  ECF No. 50 at 4–13.  For the reasons discussed more fully below, the Court finds that summary judgment is not warranted on Ms. Shealey's retaliation claims.

> **1.    Ms. Shealey has Established a Prima Facie Case of Retaliation**

To establish a prima facie case for retaliation, a plaintiff must show that (a) she engaged in a protected activity, (b) her employer took materially adverse action against her, and (c) there was a causal connection between the protected activity and the employer's action.  *See Young v. City of Phila. Police Dept.*, 651 F. App'x 90, 95 (3d Cir. 2016) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340–42 (3d Cir. 2006)).  Pittsburgh Mercy argues that Ms. Shealey cannot satisfy the third element by demonstrating that there was a causal connection between her complaints of discrimination and Pittsburgh Mercy's decision to terminate her.  ECF No. 43 at 17.  Ms. Shealey responds that there is sufficient evidence to demonstrate a causal connection between her protected activity and the Corrective Action as well as her termination.  ECF No. 50 at 7–11.  The Court agrees with Ms. Shealey.

---

[14] Ms. Shealey also cites to other evidence of pretext, including that the identity of the individuals who decided to terminate Ms. Shealey has changed over time, as have the reasons for her termination.  ECF No. 50 at 11–13, 21. Because the Court concludes that there are disputed issues of material fact that preclude summary judgment, it need not address these additional arguments.

A plaintiff's burden of establishing causation at the prima facie stage is not "onerous." *Young*, 651 F. App'x 90 at 97 (explaining that a plaintiff's burden at the prima facie stage is not as high as at the pretext stage). Proximity in timing between protected activity and an adverse employment action may be sufficient on its own to demonstrate causation if the timing is unusually suggestive. *See Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 530 (E.D. Pa. 2014) (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)). "Ordinarily, a period of less than one week is unusually suggestive." *Id.* Conversely, more than three weeks is not necessarily unduly suggestive. *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003). Where timing alone is insufficient to establish causation, "timing plus other evidence may be an appropriate test." *Id.* (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003)). And such other evidence is not limited to "demonstrative proof, such as actual antagonistic conduct or animus. Rather, it can be other evidence gleaned from the record as a whole from which causation can be inferred." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).

Here, Ms. Shealey relies on the timing between her initial complaint about S.R.'s use of the N-word and the Corrective Action as well as other circumstantial evidence to demonstrate a causal link with respect to her retaliation claims. With respect to suggestive timing, Ms. Shealey points out that on August 24, 2022, she informed Ms. Lichwala via text message that she had reported S.R.'s use of the N-word to Ms. Nash. ECF No. 56, PCSOF ¶¶ 34–35, 41. Ms. Lichwala then issued the Corrective Action nineteen days later on September 12, 2022. *Id.* ¶ 50. As a threshold matter, nineteen days between Ms. Shealey's complaint of discrimination[15] and the

---

[15] Pittsburgh Mercy disputes whether Ms. Shealey's August 24, 2022, text message to Ms. Lichwala was a complaint of discrimination. *See, e.g.*, ECF No. 55, DSOF ¶ 4; ECF No. 56, PCSOF ¶ 34. Ms. Shealey avers that Mr. Borelli admitted that a complaint about the use of the N-word was a complaint about race discrimination. ECF No. 56, PCSOF ¶ 26. Pittsburgh Mercy disagrees, contending that Mr. Borelli merely testified that he would consider a report about the use of the N-word to be a discrimination complaint "in a way." *Id.* The Court fails to see a meaningful distinction, and even if there is one, a reasonable jury could conclude that a report about the use of the N-word was a complaint

Corrective Action is within the general range of timing that may be considered unduly suggestive. *See Parish v. UPMC Univ. Health Ctr.*, 373 F. Supp. 3d 608, 636 (W.D. Pa. 2019) (Hornak, C.J.) ("[S]ixteen days qualifies as unusually suggestive timing.") (cleaned up); *Thomas*, 351 F.3d at 114 (stating that more than three weeks is not unduly suggestive).

Even if the timing alone is not unduly suggestive, the other evidence in the record is sufficient to establish a prima facie case of causation. As discussed above, there are no facts demonstrating that Pittsburgh Mercy investigated Ms. Shealey's August 24 complaint. ECF No. 56, PCSOF ¶¶ 37, 64, 66–67, 72–73; ECF No. 55, DSOF ¶ 4. The failure to investigate a report of discrimination lends itself to an inference of retaliatory intent. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 922–23 (3d Cir. 1997) (noting that the failure to respond to a report of harassment "can support an inference by the fact-finder that the [employer], having failed to respond to the harassment, also engaged in retaliatory conduct against the plaintiff"); *Stankiewicz v. Pump N' Pantry, Inc.*, No. 20-CV-2021, 2022 WL 36238, at *4 (M.D. Pa. Jan. 4, 2022) (inferring retaliatory intent at the motion to dismiss stage from the allegation that an employer failed to ask its human resources department to investigate a discrimination complaint). Additionally, the fact that the Corrective Action was the first time Ms. Shealey had been formally disciplined in her three-year tenure at Pittsburgh Mercy also lends itself to an inference of retaliation. *See* ECF No. 56, PCSOF ¶¶ 8, 51, 113; *Stankiewicz*, 2022 WL 36238, at *4 (emphasizing the plaintiff's "clean disciplinary record" prior to her report of racial discrimination). Accordingly, the Court concludes that Ms.

---

of discrimination. Moreover, it is clear that Ms. Shealey was reporting what she perceived to be discriminatory behavior. *See Amon v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) ("[P]rotesting what an employee believes in good faith to be a discriminatory practice is clearly protected conduct.").

Shealey has made out a prima facie case of retaliation under Title VII, the PHRA, and § 1981 with respect to the Corrective Action.

The same evidence that supports an inference of retaliation with respect to the Corrective Action also tends to support an inference of retaliation with respect to Ms. Shealey's termination. The undisputed facts are that Ms. Shealey was never disciplined prior to reporting S.R.'s use of the N-word, but once she did, she was in short order issued formal discipline in the form of the Corrective Action. *See* ECF No. 56, PCSOF ¶¶ 8, 50–51, 113. And Ms. Shealey's termination— like the Corrective Action—was preceded by her continued reports of S.R.'s use of the N-word. As discussed above in the context of Ms. Shealey's disparate treatment claims, after Pittsburgh Mercy issued the Corrective Action, Ms. Shealey again complained about S.R.'s use of the N-word without any consequences in a text message to both Ms. Lichwala and Mr. Borelli on September 20, 2022, but nothing came of it. ECF No. 56, PCSOF ¶¶ 55, 58, 61–62. And there are no facts indicating that Pittsburgh Mercy ever investigated Ms. Shealey's continued complaints about S.R.'s use of the N-word, even after S.R. began calling Ms. Shealey the N-word to her face in October 2022. *Id.* ¶¶ 37, 64, 66–67, 69, 72–73; ECF No. 55, DSOF ¶ 4. The lack of any evidence that Pittsburgh Mercy took action in response to Ms. Shealey's reports that S.R. had been calling her the N-word supports an inference of retaliatory intent with respect to her termination. *See Woodson*, 109 F.3d at 922–23; *Stankiewicz*, 2022 WL 36238, at *4. Accordingly, the Court finds that Ms. Shealey has established a prima facie case of retaliation under Title VII, the PHRA, and § 1981 with respect to her termination.

**2.    There are Disputed Issues of Material Fact Regarding Whether Pittsburgh Mercy's Reasons for Issuing the Corrective Action and Terminating Ms. Shealey Were Pretextual**

As with Ms. Shealey's disparate treatment claims, neither party addresses whether Pittsburgh Mercy offered satisfactory legitimate reasons for the Corrective Action and Ms. Shealey's termination;  the parties instead proceed directly to pretext.  ECF Nos. 43 at 18;  50 at 11;  54 at 3.  Accordingly, the Court does the same.

To show an employer's proffered reasons for an adverse employment action were a pretext for retaliation, a plaintiff must prove that "retaliatory animus was the 'but-for' cause of the adverse employment action." *Carvalho-Grevious*, 851 F.3d at 257–58 (explaining that a plaintiff asserting a retaliation claim "has a higher causal burden" than a plaintiff asserting a discrimination claim under Title VII);  *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).  A plaintiff establishes but-for causation where she shows "that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Carvalho-Grevious*, 851 F.3d at 258.  To meet her burden, a plaintiff's evidence "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 765);  *Carvalho-Grevious*, 851 F.3d at 262.

Here, the Court finds that the same evidence Ms. Shealey cites to establish a prima facie case of retaliation also tends to provide some support that Pittsburgh Mercy's reasons for issuing the Corrective Action and terminating Ms. Shealey were pretextual.  *See Carvalho-Grevious*, 851 F.3d at 262 (quoting *Farrell*, 206 F.3d at 286) (noting that, at the pretext stage, "[w]e rely largely on the evidence produced in support of Dr. Grevious's prima facie case, recognizing that 'nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the

22

other.'").  But more importantly, the same disputed issues of material fact that preclude summary judgment on Ms. Shealey's disparate treatment claims also preclude summary judgment on her retaliation claims.  Specifically, Ms. Shealey denies that she engaged in the behavior identified by Pittsburgh Mercy as the basis for the Corrective Action and Ms. Shealey's termination.  ECF No. 55, DSOF ¶¶ 64–68, 72–74, 76–80, 85–88;  ECF No. 56, PCSOF ¶¶ 88–94, 108–113.  If a jury were to believe Ms. Shealey's testimony that the conduct cited by Pittsburgh Mercy never occurred it could conclude, based on the other evidence in the record, that but-for Ms. Shealey's reports about S.R.'s use of the N-word she would not have been disciplined or terminated.  *See Carswell*, 2021 WL 3553522, at *8;  *Betz v. Temple Health Sys.*, No. 15-cv-727, 2016 WL 147155, at *9–10 (E.D. Pa. Jan. 13, 2016) (denying summary judgment on a plaintiff's Title VII retaliation claims because "[i]t would require the Court to find [the plaintiff's] testimony unbelievable, and instead credit [the defendant's] version of events").  Accordingly, Pittsburgh Mercy is not entitled to summary judgment on Ms. Shealey's retaliation claims under Title VII, the PHRA, or § 1981.

### D.    Pittsburgh Mercy is Entitled to Summary Judgment on Ms. Shealey's Hostile Work Environment Claims

Ms. Shealey alleges that Pittsburgh Mercy subjected her to a hostile working environment by failing to address S.R's repeated use of the N-word.  ECF No. 50.  Because the requirements for a hostile work environment claim under Title VII, the PHRA, and § 1981 are the same, the Court analyzes them together.  *See Brown v. J. Kaz, Inc.*, 581 F.3d 175, 178–79, 181–82 (3d Cir. 2009);  *Howard*, 742 F. Supp. 2d at 689.  For the reasons set forth below, the Court finds that Pittsburgh Mercy is entitled to summary judgment on Ms. Shealey's hostile work environment claims.

### 1.    Ms. Shealey Has Not Established a Prima Facie Case of a Hostile Work Environment

The Court concludes that Pittsburgh Mercy is entitled to summary judgment on Ms. Shealey's hostile work environment claims because no reasonable jury could find that she has set forth a prima facie case. To establish a prima facie case of hostile work environment, Ms. Shealey must demonstrate that she (1) suffered intentional discrimination because of her race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected Ms. Shealey, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). "In analyzing a hostile work environment claim, [courts] must look at the totality of the circumstances including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the work performance of the employee." *Kidd v. MBNA Am. Bank, N.A.*, 93 F. App'x 399, 402 (3d Cir. 2004) (citing *West v. Phila. Elec. Co.*, 45 F.3d 744, 753 (3d Cir. 1995)).

Pittsburgh Mercy argues that Ms. Shealey cannot satisfy the second and fourth elements of her prima facie case for effectively the same reason:  no reasonable person in Ms. Shealey's circumstances would have perceived S.R.'s use of the N-word to be severe or pervasive enough to create a hostile working environment. *See* ECF No. 43 at 10–15; *Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 776 n.5 (3d Cir. 2009) ("Given that the second prong, the 'severe or pervasive' element, includes both an objective and subjective inquiry, this requirement substantially overlaps with the third and fourth elements of this Circuit's hostile work environment claim, which respectively require a plaintiff to establish (i) that the discrimination detrimentally affected him and (ii) that the discrimination would have detrimentally affected a reasonable person of the same protected class in his position."). For the reasons discussed below, the Court agrees with

Pittsburgh Mercy that Ms. Shealey cannot establish a prima facie case with respect to her hostile work environment claims.

Pittsburgh Mercy cites to a line of cases supporting the proposition that "caregivers of mentally ill patients [are] not subjected to a hostile work environment simply because a mentally ill patient in their care made racially insensitive or derogatory comments." ECF No. 43 at 11. For example, Pittsburgh Mercy points to decisions by the United States Courts of Appeals for the Fifth and Seventh Circuits that have considered this issue. *See id.* at 11–14; *E.E.O.C. v. Nexion Health at Broadway, Inc.*, 199 F. App'x 351 (5th Cir. 2006); *E.E.O.C. v. Vill. At Hamilton Pointe LLC*, 102 F.4th 387 (7th Cir. 2024). In *Nexion Health*, the Fifth Circuit held that "[i]t is objectively unreasonable for an employee [working at a nursing home with mentally ill patients] to perceive a racially hostile work environment based solely on statements made by those who are mentally impaired," even where those statements occurred several times a week for several months. *See* 199 F. App'x at 353–54. As the Fifth Circuit reasoned, "[a]bsorbing occasional verbal abuse from such patients was not merely an inconvenience associated with [the plaintiff's] job; it was an important part of the job itself." *Id.* In *Hamilton Pointe*, the Seventh Circuit applied this same reasoning to conclude that certain care workers' hostile work environment claims were not cognizable because they were based solely on discriminatory statements made by mental health patients. 102 F.4th at 407–08, 413, 417.

As a general matter, the Court finds *Nexion Health* and *Hamilton Pointe* persuasive. However, while Pittsburgh Mercy avers that the Third Circuit Court of Appeals has not spoken on this issue, ECF No. 43 at 12, it has done so, albeit in a non-precedential opinion. *See Davis v. Elwyn of Penn. & Del.*, No. 22-1646, 2023 WL 3918680 (3d Cir. June 9, 2023). In *Davis*, the Third Circuit vacated an order issued by the United States District Court for the Eastern District

of Pennsylvania which granted a defendant summary judgment on a plaintiff healthcare worker's hostile work environment claim. *Id.* at *3, *5–6. The plaintiff in *Davis* had argued she was subjected to a hostile work environment when her employer gave her an ultimatum between termination or changing the bedding of a mentally ill patient who had purposefully urinated on his bed and demanded that the plaintiff clean it up. *Id.* at *2. This particular patient had incessantly directed racial slurs at the plaintiff and had sexually harassed her in the past by exposing his genitals and, in one instance, splashing water on her shirt and placing an empty water bottle on her breasts. *Id.* at *1–3. The district court, relying on *Nexion Health*, had concluded that "an objectively reasonable caretaker in this particular setting (i.e. a locked down psychiatric institute) would not have been detrimentally affected" by the patient's use of racial slurs and sexual harassment. *Davis v. Elwyn, Inc.*, No. 20-CV-05798, 2022 WL 970842, at *6–7 (E.D. Pa. Mar. 31, 2022). In vacating the district court's ruling, the Third Circuit emphasized that by ordering the plaintiff to clean up after the patient, her employer had "ordered [her] to reenter an intolerably harassing and ***perhaps even dangerous situation***." *Davis*, 2023 WL 3918680, at *5 (emphasis added). Thus, the Third Circuit held that "[a] reasonable employee could expect to receive support and protection from her employer rather than instructions to submit to dehumanizing and ***potentially dangerous behavior***," and vacated the district court's order. *Id.* at *5–6 (emphasis added).

On balance, the Court finds that *Davis* is not inconsistent with *Nexion Health* and *Hamilton Pointe*. As noted by the Seventh Circuit, *Nexion Health* did not create "a categorical bar on hostile environment claims arising from harassment by patients." *Hamilton Pointe*, 102 F.4th at 407 (quoting *Gardner v. CLC of Pascagoula, LLC*, 915 F.3d 320, 326 (5th Cir. 2019)). Rather, the touchstone of any hostile work environment analysis involving a mentally ill patient remains the

"unique circumstances" confronted by the plaintiff. *Id.*; *accord Kidd*, 93 F. App'x at 402 (tasking courts to look to the totality of the circumstances when analyzing hostile work environment claims). Thus, even after *Nexion Health*, the Fifth Circuit has found cognizable hostile work environment claims when a mentally ill patient creates an environment "outside the realm of a mere offensive utterance." *Gardner*, 915 F.3d at 327. The Court construes *Davis* as presenting such a case.

Here, Ms. Shealey was responsible for dealing with mentally ill patients. ECF No. 55, DSOF ¶¶ 28, 34; ECF 45-2 at 85. S.R. was one such patient; she suffered from Down syndrome, Alzheimer's, and dementia. ECF No. 55, DSOF ¶ 38. Any reasonable person in Ms. Shealey's position would not have perceived a severe or pervasive hostile working environment based on S.R.'s repeated use of the N-word. *See Nexion Health*, 199 F. App'x at 352–54; *Hamilton Pointe*, 102 F.4th at 413, 416; *Matu-Dadie v. Wernersville State Hosp.*, No. 17-cv-5451, 2018 WL 4501538, at *4–5 (E.D. Pa. Sept. 20, 2018). Moreover, it is undisputed that Ms. Shealey was a casual pool employee who was free to choose the location where she worked. ECF No. 55, DSOF ¶¶ 31–32. Nevertheless, Ms. Shealey continued to choose to work at Pittsburgh Mercy's Norwich facility where S.R. was housed. *Id.* ¶ 33. This too cuts against her hostile work environment claim. *See Hamilton Pointe*, 102 F.4th at 420–21 (affirming the district court's dismissal of a nurse's hostile work environment claim and noting that the district court had properly considered the fact that the nurse had not asked to be re-assigned after being called the N-word by a patient).

For the foregoing reasons, Pittsburgh Mercy is entitled to summary judgment on Ms. Shealey's hostile work environment claims under Title VII, the PHRA, and § 1981.

IV.    **Conclusion**

For the foregoing reasons, Defendant Pittsburgh Mercy's Motion for Summary Judgment will be GRANTED IN PART AND DENIED IN PART, as set forth in the attached Order.

DATED this 29th day of January, 2025.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record

28